UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JEREMIE SMITH

                              Plaintiff,

                                                                DECISION AND ORDER

          v.

                                                                Case # 13-CV-6127-FPG

BRIAN FISCHER, et al.,

                              Defendants.

---

        Before the Court is a motion to dismiss filed by various defendants in this case.  ECF No.

36.

## **BACKGROUND**

        This case is made up of two separate actions.  The Court previously consolidated the

action bearing case number 6:13-cv-6208 into the present action, which bears case number 6:13-

cv-6127.  ECF No. 35.  Thus, for purposes of the pending motion to dismiss (ECF No. 36), two

complaints are at issue.[1]

        As the Court said in its consolidation order, the two complaints filed by Plaintiff Jeremie

Smith ("Smith") are "extraordinarily long and prolix"—they add up to about 230 pages along

with about 160 pages of exhibits.  *Id.* at 1.  Additionally, Smith has filed roughly 250 pages of

letters, affidavits, and exhibits that either repeat allegations in the complaints or duplicate

---

[1]        The Court will cite documents filed in the 6:13-cv-6208 action prior to consolidation in
the following form: "6208, ECF No. __."  Documents filed in the 6:13-cv-6127 action, both
before and after consolidation, will be cited in the Court's usual form: "ECF No. __."

exhibits attached to the complaints.  ECF Nos. 4; 5; 7; 11; 15; 18; 25; 26; 27; 28; 29; 31.[2]  Based on the complaint's captions, Smith is suing about 60 different defendants.[3]

A global factual narrative of the complaints is not feasible as Smith's claims are based on a litany of separate factual scenarios.  By way of brief background, at the time Smith filed his complaints, he was a prisoner at Five Points Correctional Facility ("Five Points") in Romulus, New York.  Smith has since been released from prison.  He brought this action *pro se* for money damages as well as declaratory and injunctive relief under 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act.  The defendants all appear to be officials who work for the New York State Department of Corrections and Community Supervision ("DOCCS"); almost all of them work specifically at Five Points.  Smith has sued all of them in their official and individual capacities.

Generally speaking, Smith's allegations revolve around confinement conditions at Five Points and various uses of force by Five Points officials.  For example, Smith consistently references his "psychogenic dysphagia"—which is essentially a persistent fear of choking when eating—and asserts that officials at Five Points did not feed him an appropriately "soft" diet for 14 to 18 months.  ECF No. 1 at, *e.g.*, ¶¶ 50–57, 60–67, 73, 136.  Accordingly, Smith alleges that

---

[2]    Smith has also filed multiple letters and declarations concerning both an alleged retaliatory transfer from Five Points to Great Meadow Correctional Facility ("Great Meadow"), and then various problems he had while at Great Meadow.  ECF Nos. 6; 9; 17; 33.  The issues in these letters and declarations are not properly before the Court, and it will correspond with Smith about these issues in a separate letter.

[3]    Smith is proceeding *in forma pauperis*, and thus his complaints were subject to screening under 28 U.S.C. § 1915.  In a previous screening order, the Court dismissed a few of these defendants.  6208, ECF No. 7.

The Court also notes that, based on the bodies of the complaints, Smith may actually be making claims against even more individuals than just those listed in the complaints' captions.

he could not eat the food he was served and thus suffered from malnutrition.[4] *Id.* at, *e.g.*, ¶¶ 60–67. Smith also alleges that, for instance, his in-cell toilet was broken for five days (*id.* at ¶¶ 101–05) and that he was denied access to a razor for shaving for "over a month" (*id.* at ¶ 112). As for the excessive force claims, Smith alleges in one instance that an official struck his leg with an extraction shield after Smith, by his own words, "urinated out of his feed up slot in his cell door . . . [and] [t]hen stuck his leg out through the food slot in his cell door and refused to pull his leg back into his cell." 6208, ECF No. 1 at ¶ 53. In another separate instance, Smith alleges that after he "began to verbally curse and threaten [an officer]," the officer applied a metal waist chain excessively tight, causing Smith pain and suffering. ECF No. 1 at ¶ 109.

These allegations will be discussed in detail below.

## DISCUSSION

In the pending motion, 24 of the defendants move to dismiss the claims against them under Rule 12(b)(6) of the Federal Rules of Civil Procedure. ECF No. 36 at 2–16. Additionally, the defendants have asked the Court to dismiss both complaints without prejudice for failure to comply with Rule 8 of the Federal Rules of Civil Procedure. *Id.* at 1.

Before addressing these arguments, the Court raises two preliminary issues *sua sponte*. These issues relate to, first, Smith's claims for injunctive and declaratory relief, and second, to

---

[4]     The voluminous exhibits Smith has filed are illuminating as to the types of soft foods Smith believed he could eat without choking. For example, he requested at various times hot chocolate, peanut butter, ice cream, jelly, apple sauce, pudding, and sugar. ECF Nos. 1 at p. 127; 12 at 42; 38-1 at 18. By contrast, he did not want meals like the one he was served on June 16, 2012, which consisted of a "salad, a burnt piece of meat loaf and mashed potatoes with skins mixed in them." ECF No. 29 at 16.

Due to Smith's alleged inability to eat the food he was served, he was placed on "hunger strike" status at Five Points. ECF No. 1 at ¶ 72. He remained on hunger-strike status for an extended period of time because, as a nurse recounted in a medical record that Smith filed along with his response to the motion to dismiss, "[Smith] believes that his hunger strike status is part of the 'proof' that he needs to win a lawsuit against the State of New York that he is being mistreated in prison." ECF No. 38-1 at 55.

his claims for money damages under the ADA and Rehabilitation Act.

## I.   Claims for Injunctive and Declaratory Relief

Smith makes several claims for declaratory and injunctive relief.  Specifically, he

requests a declaratory judgment stating that the defendants' medical care and uses-of-force

violated the Eighth and Fourteenth Amendments.  ECF No. 1 at ¶ 152(A); 6208, ECF No. 1 at p.

120.  He also requests injunctive relief in the form of a visit to an outside hospital, a dietary

consultation, an audiological consultation, an orthopedic consultation, and a psychiatric

assessment.  ECF No. 1 at ¶ 152(B); 6208, ECF No. 1 at p. 120–21.

The docket reflects that Smith has been released from prison since the time he requested

this declaratory and injunctive relief.  It is settled in the Second Circuit that an inmate's release

from prison moots his claims for declaratory and injunctive relief against the prison's officials.

*See Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006); *Mawhinney v. Henderson,* 542 F.2d

1, 2 (2d Cir. 1976); *see also Pugh v. Goord*, 571 F. Supp. 2d 477, 489 (S.D.N.Y. 2008)  ("Where

a prisoner has been *released* from prison, his claims for injunctive relief based on the conditions

of his incarceration must be dismissed as moot.") (emphasis in original).  Accordingly, Smith's

claims for declaratory and injunctive relief, all of which are based on the conditions at Five

Points, are now dismissed as moot.

## II.   Claims for Money Damages Under the ADA and Rehabilitation Act

The Court next addresses Smith's claims for money damages under the ADA and

Rehabilitation Act, both of which are specifically cited in one of Smith's complaints.  ECF No. 1

at p. 2.  Generally speaking, Title II of the ADA and Section 504 of the Rehabilitation Act

protect disabled individuals from being excluded from public services.  *See* 42 U.S.C. § 12132;

29 U.S.C. § 794.  Both provisions apply to inmates in state prisons.[5]  *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998) (ADA); *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1035–36 (S.D.N.Y. 1995) (Rehabilitation Act).

Neither the ADA nor the Rehabilitation Act, however, provide for liability against defendants in their individual capacities.  *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).  Accordingly, to the extent Smith is suing any defendants in their individual capacities under the ADA or Rehabilitation Act, those claims are dismissed.  *See* 28 U.S.C. § 1915(e)(2)(B)(ii) (mandating dismissal of *in forma pauperis* actions "at any time" if the court determines that the action fails to state a claim).

As for Smith's official-capacity claims under the ADA and Rehabilitation Act, the Court observes that "the State is the real party in interest for . . . claims against . . . individual defendants in their official capacities."  *Fox v. State Univ. of N.Y.,* 497 F.Supp.2d 446, 451 (E.D.N.Y. 2007).  Stated differently, a judgment against a public official in his official capacity imposes liability on the entity he represents, provided that the entity received notice and an opportunity to respond.  *Brandon v. Holt*, 469 U.S. 464, 471–72 (1985).

Here, the entity represented by the defendants in this case is DOCCS, and DOCCS has, of course, received notice and an opportunity to respond to Smith's complaints.  Because DOCCS is the real party in interest for the official-capacity claims, the Court hereby dismisses the the ADA and Rehabilitation Act claims against the individual defendants in their official capacities.  *See Hallett v. New York State Dep't of Corr. Servs.,* 109 F. Supp. 2d 190, 199–200 (S.D.N.Y. 2000) ("Because plaintiff is able to assert his ADA and Rehabilitation Act claims against DOCS

---

[5]    As a slight qualification that does not affect this analysis, the Rehabilitation Act applies to inmates in state prisons as long as the prison is accepting federal funding.  *See Clarkson v. Coughlin*, 898 F.Supp. 1019, 1035–36 (S.D.N.Y. 1995).

directly . . . there is no justification for allowing plaintiff to also assert ADA and Rehabilitation Act claims against the individual defendants in their official capacities."); *see also B.D.S. v. Southold Union Free Sch. Dist.*, No. CV-08-1319 SJF WDW, 2009 WL 1875942, at *21 (E.D.N.Y. June 24, 2009).  DOCCS is now substituted as the sole defendant for the ADA and Rehabilitation Act claims.

### III.   Dismissal Under Rule 8

The Court now turns to the arguments in the defendants' motion to dismiss.  The defendants first argue that both of Smith's complaints should be dismissed without prejudice because they fail to comply with Rule 8 of the Federal Rules of Civil Procedure.

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint present a "short and plain statement of the claim showing that the pleader is entitled to relief."  Shortness and plainness are prescribed because the purpose of a complaint is simply to provide the adverse party with fair notice of the plaintiff's claim.  *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1998).  "Unnecessary prolixity in [the complaint] places an unjustified burden on the district judge and the party who must respond to it because they are forced to ferret out the relevant material from a mass of verbiage."  5 C. Wright & A. Miller, *Fed. Prac. & Proc. Civ.* § 1281 (3d ed. 1998).

There is no doubt that Smith has included a vast amount of unnecessary detail in his two complaints.  As will become clear momentarily, Smith writes at length about what appear to be, frankly, the relatively minor inconveniences associated with prison life.  The Second Circuit has been clear, however, that there is a difference between a complaint that simply includes a large amount of unnecessary detail and a complaint that is wholly "unintelligible" and "defie[s] comprehension."  *Shomo v. State of New York*, 374 F. App'x 180, 183 (2d Cir. 2010) (citations

and internal quotations omitted). Dismissal under Rule 8 is generally warranted only in the second category of cases where, in short, the complaint is so rambling that it is incomprehensible. *See id.* at 182–83. The case that the defendants rely on in seeking dismissal under Rule 8, *Ceparano v. Suffolk Cty.*, No. 10-CV-2030-SJF-ATK, 2010 WL 5437212, at *2 (E.D.N.Y. Dec. 15, 2010), is also clear on this point: "[D]ismissal of a complaint in its entirety should be reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any is well disguised." *Id.* at *3 (citations and internal quotations omitted).

By contrast, where a complaint "enunciate[s] recognizable unconstitutional behavior" despite its unnecessary length and detail, a district court should not dismiss the complaint, even without prejudice. *See Shomo*, 374 F. App'x at 182. Here, Smith's two complaints clearly fall into the first category of complaints; while they are certainly not models of clarity or brevity, they are also not "unintelligible" nor "a labrynthian prolixity of unrelated and vituperative charges that def[y] comprehension." *Prezzi v. Schelter*, 469 F.2d 691, 692 (2d Cir. 1972). Smith has described, in clear handwriting and in a relatively understandable manner, multiple uses of force by Five Points officials and, more generally, "the day-to-day events . . . [that] concern the activities of his daily living." *Shomo*, 374 F. App'x at 183. It is clear to the Court that his claims "center[] around his disability and the alleged deliberate indifference to his serious medical needs," and that is enough at this stage in the litigation. *Id.* It is acknowledged, of course, that Smith's lengthy complaints place a heavy burden on both the New York Attorney General's Office, which represents all of the defendants in this action, and this Court. The law is, however, unambiguous on this point—dismissal under Rule 8 is not warranted for these types of complaints.

## IV.    Claims for Money Damages Under Section 1983

The Court now addresses Smith's claims for money damages under 42 U.S.C. § 1983.

This statute imposes liability on anyone who, under color of state law, deprives a person "of any

rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.  In

other words, to recover under this provision, a plaintiff must show a violation of a federal

constitutional or statutory right.

In the pending motion, as stated above, 24 of the defendants now move to dismiss the

Section 1983 claims against them under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept the factual

allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.

*See Nechis v. Oxford Health Plans, Inc.,* 421 F.3d 96, 100 (2d Cir. 2005).  To survive a motion

to dismiss, "a complaint must contain sufficient factual matter . . . 'to state a claim to relief that

is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

*Twombly,* 550 U.S. 544, 570 (2007)).  To meet this standard, the factual allegations must permit

the court "to infer more than the mere possibility of misconduct."  *Iqbal*, 556 U.S. at 679.

Because Smith is proceeding *pro se,* the Court must "construe [the] complaint liberally

and interpret it to raise the strongest arguments that it suggests." *Chavis v. Chappius,* 618 F.3d

162, 170 (2d Cir. 2010) (citation and internal quotations omitted).  "Even in a *pro se* case,

however, . . . threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." *Id.* (citations and internal quotations omitted).  So while

the Court will draw the most favorable inferences that the complaint supports, it will not "invent

factual allegations that [the plaintiff] has not pled." *Id.*

The Court makes one final preliminary point before turning to the individual defendants.

8

As stated previously, Smith has sued all of the defendants in their official and individual capacities. ECF No. 1 at p. 2; ECF No. 1 at p. 2; 6208. To the extent Smith seeks damages from the DOCCS officials in their official capacities under Section 1983, those claims are barred by the Eleventh Amendment. *See Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under § 1983] for money damages against state officials in their official capacities."). Accordingly, all official capacity claims for money damages brought under § 1983 are hereby dismissed. *See* 28 U.S.C. § 1915(e)(2)(B)(iii) (mandating dismissal of *in forma pauperis* actions "at any time" if the court determines that the defendants are immune from monetary relief).

Below, the Court addresses the arguments of each defendant, and occasionally groups together those defendants who make similar arguments for dismissal.

### *A. Defendants Abbott, Lt. Gardener, and Patches*

Defendants Abbott, Lt. Gardener,[6] and Patches are all corrections officials at Five Points. The only claims against them are straightforward. Smith alleges that on December 1, 2011, he was on "in cell 'water deprivation,'" (ECF No. 1 at ¶ 101) (internal quotations in original) which—as is apparent from other parts of the complaints—is where officials turn off an inmate's in-cell sink and toilet water after the inmate is accused of intentionally flooding his cell (*id.* at ¶¶ 58–59). Smith alleges that on December 1, 2011 he asked Officer Filighera, another Five Points corrections official who is a defendant in this case, to turn his in-cell water back on. ECF No. 1 at ¶ 101. Filighera turned on Smith's sink water but "walked off . . . without turning on the [his] toilet water." *Id.* Later that day, Smith informed Officer Patches that his toilet water was still off, and Patches apparently came back to Smith's cell shortly theLthereafter with Filighera. *Id.* at ¶

---

[6] There appears to be both a "Gardener" who is a nurse and a "Gardener" who is a corrections officer. This analysis refers to the Gardener who is a corrections officer.

102.  Both officers made "several attempts to turn on the plaintiff[']s toilet water to no avail."

*Id.* at ¶ 102.  Patches told Smith that the valve on Smith's toilet was broken, and that he would

place a work order for Smith's toilet to be fixed.  *Id.* at ¶ 103.

The next day, December 2, 2011, Smith informed Officers Abbott and Lt. Gardener that

his toilet was still broken.  *Id.* at ¶ 103.  "After several attempts were made to fix the plaintiff[']s

toilet," Lt. Gardener and another official in this case[7] informed Smith once again that his toilet

valve was broken and that they would place another work order for Smith's toilet to be fixed.  *Id.*

at ¶ 104.  On December 5, 2011, a plumber fixed Smith's toilet.  *Id.* at ¶ 105.

In sum, Smith alleges that for five days from December 1, 2011 to December 5, 2011, he

was left inside his cell "with accumulated waste and a broken toilet."  *Id.* at ¶ 105.

Plaintiff is effectively attempting to state a conditions-of-confinement claim against the

three officials at issue under the Eighth Amendment, which prohibits "cruel and unusual

punishments.  U.S. Const. amend. VIII.  To state a valid conditions-of-confinement claim, an

inmate must allege that: "(1) objectively, the deprivation the inmate suffered was sufficiently

serious that he was denied the minimal civilized measure of life's necessities, and (2)

subjectively, the defendant official acted with a sufficiently culpable state of mind . . . , such as

deliberate indifference to inmate health or safety."  *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir.

2013) (citations and internal quotations omitted) (ellipses in original).

Smith's conditions-of-confinement claim against Abbott, Lt. Gardener, and Patches fails

to pass the motion-to-dismiss threshold.  In short, regardless of whether a broken toilet with

"accumulated waste" is an objectively serious condition under the Eighth Amendment, Smith has

failed to show how he could satisfy the subjective prong of the test.  In other words, Smith has

---

[7]       The claims against this official, Officer Terry, are discussed in Part IV.Q, *infra.*

failed to allege that Abbott, Lt. Gardener, or Patches were deliberately indifferent to his health and safety. By Smith's own words, Abbott, Lt. Gardener, and Patches were actually quite diligent in trying to fix Smith's toilet: On the same day Smith told Officer Patches about the broken toilet, Patches made "several attempts to turn on the plaintiff[']s toilet water" before then placing a work order for the toilet to be fixed. On the next day, when Smith told Defendants Abbott and Lt. Gardener about his broken toilet, Abbott and Gardener also made "several attempts . . . to fix the plaintiff's toilet" before placing yet another work order for it to be fixed. The toilet was then fixed five days after Smith's original complaint.

On these allegations, Smith has not at all indicated that Abbott, Lt. Gardener, or Patches were deliberately indifferent to this admittedly unfortunate condition. For this reason, the motions to dismiss by Abbott, Lt. Gardener, and Patches are GRANTED.

### B. Defendant Atwood

Defendant Atwood is another corrections official at Five Points. Smith attempts to state an excessive force claim against Atwood by alleging as follows: On March 20, 2012, Smith "became mentally unstable and urinated out of his feed up slot in his cell door. The plaintiff then stuck his leg out through the food slot in his cell door and refused to pull his leg back into his cell." 6208, ECF No. 1 at ¶ 53. Atwood then allegedly "authorized" another official in this case to "sneak up along side of the plaintiff[']s cell to 'strike' the plaintiff in the leg with the N.Y.S. DOCCS extraction shield without any warning to the plaintiff." Id. (quotations in original).

Smith's claim for excessive force also arises under the Eighth Amendment. To state an excessive force claim, an inmate must allege that: (1) "the conduct was objectively harmful enough or sufficiently serious to reach constitutional dimensions," and (2) "the defendant acted with a subjectively sufficiently culpable state of mind," which is "characterized by wantonness in

light of the particular circumstances surrounding the challenged conduct." *Harris v. Miller*, ---

F.3d ---, No. 14-2957, 2016 WL 963904, at *10–12 (2d Cir. Mar. 15, 2016) (citations and

internal quotations omitted).

In his motion to dismiss, Defendant Atwood skips the excessive force analysis altogether

by attempting to neatly parse Smith's allegations.  In short, Atwood argues that Smith never

alleged in the complaint that another official actually struck Smith in the leg with an extraction

shield; rather, Smith merely alleged that Atwood "authorized" another officer to strike Smith in

the leg with a shield.  ECF No. 36-1 at 3–4.  Atwood thus asserts that because a mere verbal

threat in a prison setting cannot rise to the level of a constitutional violation, the § 1983 claim

against him must be dismissed.  *Id.*

While it is generally true that verbal harassment does not rise to the level of a

constitutional violation, the Court finds that the claim against Atwood can be dismissed more

directly.  Even if an officer followed Atwood's order and struck Smith in the leg, Smith has

failed to make sufficient allegations to state an excessive force claim.  First, as for the objective

prong, Smith has failed to allege that he suffered any sort of injury or harm from the incident.

*Pesola v. City of New York*, No. 15-CV-1917 (PKC)(SN), 2016 WL 1267797, at *7 (S.D.N.Y.

Mar. 30, 2016) ("Courts in this Circuit regularly hold that a plaintiff must have sustained some

injury to maintain a claim of excessive force.  That injury, however, need not be severe.")

(internal citations omitted) (collecting cases).  Thus, Smith fails to satisfy the first prong of the

excessive-force test.

As for the subjective prong, Smith admits that the entire situation resulted from him

urinating out of the feed-up slot in his cell door, sticking his leg out of the slot, and then refusing

to pull his leg back into his cell.  6208, ECF No. 1 at ¶ 53.  Given that the subjective prong is

characterized by "wantonness *in light of the particular circumstances*," *Harris*, 2016 WL 963904 at *10 (emphasis added) (citations and internal quotations omitted), these particular circumstances show that the force used used was not malicious or wanton; rather, it was an understandable effort to exert control over an out-of-control inmate. *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (observing that a "good-faith effort to maintain or restore discipline" does not support an excessive force claim). Given that, once again, Smith has not alleged that he suffered any injury, it also appears to have been a proportional effort exert such control. This sort of force is antithetical to an excessive force claim.

For these reasons, the motion to dismiss by Defendant Atwood is GRANTED.

### C. Defendants Bellnier, Koenigsmann, and Van Buren

Defendants Bellnier, Koenigsmann, and Van Buren are all DOCCS supervisory officials. Bellnier is the Deputy Commissioner for Correctional Facilities, Dr. Koenigsmann is the Deputy Commissioner/Chief Medical Officer, and Van Buren is the Assistant Commissioner.

As for Dr. Koenigsmann, Smith alleges that he "sent numerous complaints of medical neglect and abuse" to Koenigsmann. ECF No. 1 at ¶ 134. Smith alleges that Koenigsmann simply assigned the investigations of these complaints to subordinates without investigating the complaints himself. *Id.*

The Court deals with these allegations briefly. As will be revisited throughout this Decision, for a plaintiff to receive a damages award under § 1983, he must show that the defendant in question was personally involved in the alleged constitutional deprivation. *See Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001). There are a variety of ways that a defendant can be personally involved in a deprivation, *see Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), but as a general rule, an official does not become personally involved by merely

forwarding a prisoner's complaint to a subordinate. *See Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) ("[I]f an official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter."). Here, Koenigsmann's only alleged involvement in the alleged "medical neglect and abuse" was his receipt and forwarding of Smith's letters. This is not enough to support a § 1983 claim, and thus, Smith's claim regarding the matters raised in the letters he sent to Dr. Koenigsmann is dismissed.

Additionally, to the extent Smith is seeking to hold Koenigsmann liable for simply failing to investigate his complaints, the law is settled that "that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *See McCloud v. Prack*, 55 F. Supp. 3d 478, 481 (W.D.N.Y. 2014) (citations and internal quotations omitted). Accordingly, any claim based on a failure to investigate is dismissed.

Smith makes similar allegations against Bellnier, Koenigsmann, and Van Buren as a group. By way of brief background, Smith asserts throughout the 6:12-cv-6127 complaint that he is afflicted with "psychogenic dysphagia," which essentially is a persistent fear of choking when eating. ECF No. 1 at, *e.g.*, ¶¶ 47–57. Smith further asserts throughout this complaint that Five Points officials did not feed him an appropriately "soft" diet over a period of 14 to 18 months, and thus he suffered from malnutrition. *Id.* at, *e.g.*, ¶¶ 60–67, 136.

With this background in mind, Smith asserts that an attorney at Prisoners' Legal Services of New York wrote to Bellnier, Koenigsmann, and Van Buren in November 2011 regarding Smith's inadequate diet. *Id.* at ¶ 135. Smith alleges that despite this letter, Bellnier, Koenigsmann, and Van Buren "did not intervene . . . to prevent the abuse and neglect of the plaintiff." ECF No. 1 at ¶ 136. In short, Smith alleges that they ignored the letter and did not

provide him with a suitable diet. *Id.*

Smith has once again failed to adequately allege that Bellnier, Koenigsmann, or Van Buren were personally involved in the diet-related deprivation. In short, as a general rule, an "allegation that a supervisory official ignored a prisoner's letter protesting unconstitutional conduct is not itself sufficient to allege the personal involvement of the official so as to create liability under § 1983." *Richardson v. Coughlin*, 101 F. Supp. 2d 127, 132 (W.D.N.Y. 2000) (citations and internal quotations omitted). Notably, the fact that this letter was written *on behalf of the prisoner* as opposed to *by the prisoner himself* is not legally significant. Whether an official becomes personally involved in a deprivation after receiving a letter turns on the degree to which the official "personally look[ed] into the matters raised in the letter." *Rivera*, 655 F. Supp. 2d at 238. Here, there are no allegations that Bellnier, Koenigsmann, or Van Buren "personally look[ed] into" the matters raised in the letter or responded in any way. Without these types of allegations, Smith has not stated a claim against Bellnier, Koenigsmann or Van Buren.

Accordingly, Bellnier, Koenigsmann, and Van Buren's motions to dismiss are GRANTED.

### D. Defendant Bianconi

Defendant Bianconi is a mental health therapist at Five Points. In a single paragraph of one of the complaints, Smith makes the following brief allegations against Bianconi: "Bianconi [was] well aware of the plaintiff's psychiatric [d]iagnosis of 'psychogenic dysphagia.'" ECF No. 1 at ¶ 137 (internal quotations in original). Despite Bianconi's alleged awareness of Smith's condition, Bianconi "allowed [him] to be placed on an in cell 'hunger strike' from 12-25-2011– 4-3-2012 without being properly monitored by [t]he [Five Points] medical and mental health

staff." *Id.* (internal quotations in original).  Here, the Court notes that Smith's allegation that he was "placed on . . . hunger strike" refers to the fact that Five Points officials placed him on hunger-strike status as a precautionary measure because he was unwilling or unable to eat the food he was served.  *Id.* at, *e.g.*, ¶ 72 (internal quotations omitted); *see also supra* note 4.

Smith is effectively attempting to state a claim for deliberate medical indifference against Bianconi.  Once again, however, Smith has failed to sufficiently alleged that Bianconi was personally involved in the diet-related deprivation, so Bianconi cannot be liable for damages under § 1983.  *See Gaston*, 249 F.3d at 164.  In short, the only allegation against Bianconi—she was "well aware" of Smith's problem yet did not nothing to resolve it—is exactly the type of bare, conclusory allegation that cannot be credited on a motion to dismiss.  *Iqbal*, 556 U.S. at 680 (disregarding as conclusory allegations that officials "knew of" yet "condoned" harsh conditions of confinement); *see also Bellamy v. Mount Vernon Hosp.*, No. 07 CIV. 1801 (SAS), 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd sub nom. Bellamy v. Mount Vernon Hosp.*, 387 F. App'x 55 (2d Cir. 2010) ("[The plaintiff's] conclusory allegations that [the prison official] must have known about [the plaintiff's] plight is not enough to impute section 1983 liability").

For these reasons, Bianconi's motion to dismiss is GRANTED.

### *E. Defendant Bradley*

Defendant Bradley is a corrections official at Five Points.  Smith alleges that on March 28, 2012, Bradley came to Smith's cell to pass out his dinner.  6208, ECF No. 1 at ¶ 68.  Bradley allegedly ordered Smith to go to the back of his cell, face the wall, get down his knees, and place

his hands on his head.[8]  *Id.*  Smith, by his own admission, refused Bradley's order, and thus

Bradley declined to give Smith his dinner that night.  *Id.*  Smith also alleges that Bradley told a

nurse not to give Smith his nutritional supplement and psychiatric medications.  *Id.*

Smith also adds that his cell on March 28, 2012 was "completely bare," that is, it was

missing sheets and toiletries.[9]  *Id.* (internal quotations omitted).  Accordingly, Smith asked

Bradley to provide him with certain items including bed sheets, a blanket, toilet paper, soap, and

toothpaste.  *Id.*  Bradley allegedly "denied the plaintiff these [items], and advised the plaintiff to

speak with RMHU Security Captain P. Piccolo in order to receive [them]."  *Id.*

The Court first addresses Bradley's alleged failure to give Smith his dinner and

nutritional supplement (which Smith drinks as a sort of meal replacement).  In short, even

assuming this allegation is true, it is clear in this Circuit that the failure to receive one or two

meals in prison is a *de minimis* deprivation that does not support constitutional claim.  *See, e.g.*,

*Parker v. Peek-Co*, No. 06-CV-1268, 2009 WL 211371, at *4 (N.D.N.Y. Jan. 27, 2009) ("While

plaintiff alleges that he was deprived of two meals on that date as a result of the defendant's

actions, such a deprivation, while not to be condoned, is *de minimis* and does not rise to a level

of constitutional significance."); *Cagle v. Perry*, No. 9:04CV1151(TJM/GHL), 2007 WL

3124806, at *14 (N.D.N.Y. Oct. 24, 2007), *report and recommendation adopted*, No.

9:04CV1151(TJM/GHL), 2007 WL 3124806, at *14 (N.D.N.Y. Oct. 24, 2007) ("[T]wo meal

deprivations . . . [are] not sufficiently numerous, prolonged or severe to rise to the level of an

---

[8]     Based on exhibits Smith attached to a motion for a preliminary injunction he previously
filed in this case, Smith was required to get in this position before receiving meals "[d]ue to
numerous instances of unhygienic acts . . . as well as obstructing the closing of feed-up hatches
with property or hands or feet."  ECF No. 12 at 62.
[9]     It appears that Smith's cell was "completely bare" on March 28, 2012 due to concerns
over his mental health.  Smith had spent the previous five days, from March 23, 2012 to March
28, 2012, in the Residential Crisis Treatment Program at Five Points.  6208, ECF No. 1 at ¶¶ 66–
67.

Eighth Amendment violation.") (emphasis omitted). Thus, the claim against Bradley regarding his failure to give Smith his dinner and nutritional supplement on March 28, 2012 is dismissed.

Similarly, Bradley's alleged refusal to provide Smith with bed sheets, a blanket, and toiletries also falls squarely within the realm of a *de minimis* deprivation. Notably, Smith has not even alleged that he was without these items for the night of March 28, 2012; he has merely alleged that Bradley told him to talk to another official about the items. However, even assuming Smith was without bed sheets, a blanket, and certain toiletries on the night of March 28, 2012, such a brief and intermittent deprivation of these sorts of items is *de minimis*. *See, e.g.,* *Phelan v. Zenzen*, No. 10-CV-6704 CJS, 2012 WL 5420423, at *5 (W.D.N.Y. Nov. 6, 2012) (holding that the denial of a pillow and razor for several nights did not violate constitutional rights); *Loadholt v. Lape*, No. 9:09-CV-0658, 2011 WL 1135934, at *4 (N.D.N.Y. Mar. 3, 2011), *report and recommendation adopted*, No. 9:09-CV-0658 LEK RFT, 2011 WL 1114253 (N.D.N.Y. Mar. 25, 2011) ("[C]ourts in this Circuit have found the deprivations of better pain medicine, a cane, a mattress, a pillow, or better shoes, as the Plaintiff has alleged, do not meet, neither singularly nor collectively, the objective standard under the Eighth Amendment."). Simply put, "the Constitution does not require comfortable prison conditions." *Walker*, 717 F.3d at 125 (2d Cir. 2013) (citations and internal quotations omitted).

Finally, the Court addresses Bradley's alleged directive to a nurse to not provide Smith with his psychiatric medications on March 28, 2012.

Smith has effectively attempted to state a deliberate indifference claim against Bradley for a temporary interruption in medical treatment. The deliberate indifference standard under the Eighth Amendment has two components: "First, the alleged deprivation must be, in objective terms, sufficiently serious. Second, the charged official must act with a sufficiently culpable

18

state of mind." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (internal citations and quotations omitted). Notably, the Second Circuit has provided guidance on the first prong when the basis for the claim is a temporary disruption in medical treatment. *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003). In short, instead of focusing on the inmate's "*underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,'" the Court must focus on the "challenged *delay* or *interruption* in treatment." *Id.* (emphasis in original) (quoting *Chance*, 143 F.3d at 702). Consequently, to satisfy the objective prong, a plaintiff who temporarily did not receive his medication cannot just allege that he has an objectively serious medical condition like depression. Rather, the Court will look to, most importantly, the "actual medical consequences that flow from the alleged denial of care" in determining whether the prong is satisfied. *Smith*, 316 F.3d at 187.

Here, Smith has failed to identify a single medical consequence that resulted from his alleged failure to receive his psychiatric medications on March 28, 2012. He has simply alleged, without any other detail, that he failed to receive his medications on a single night. Furthermore, even apart from his failure to identify a medical consequence flowing from this interruption, the complaint is devoid of any other "relevant facts and circumstances" regarding the deprivation that might allow him to survive a motion to dismiss. *Id.* (observing broadly that courts should examine the "specific factual context of each case" to determine whether the interruption in treatment is sufficiently serious). Notably, Smith also does not identify what drugs he was actually denied, and, more generally, he does not even say what psychiatric problems he was suffering from on March 28, 2012. Without providing this sort of information, Smith has failed to adequately allege that the interruption in treatment was sufficiently serious. Accordingly, Bradley's motion to dismiss is GRANTED.

### F. Defendant Burri

Defendant Burri is a corrections official at Five Points.  All of the events involving Burri occurred on December 30, 2011.

First, Smith alleges that while he was lying on a medical examination table with his shirt unbuttoned, Burri made the following remarks: "Smith! You should get your nipples pierced, I had mine done;" and "If I was locked in a cell all day long all I would do is beat off and smoke weed." ECF No. 1 at ¶¶ 96–97.  Additionally, while Burri and Parish—another officer who is a defendant in this case—were escorting Smith back to his cell, Parish said, "Smith! Whenever I jerk off all my fluids come out of my dick and I get dehydrated." *Id.* at ¶ 99.  Burri and the other officers allegedly laughed at this comment. *Id.*  Finally, Smith alleges that during the same walk back to his cell, Burri intentionally stepped on the back of Smith's shoe, causing the shoe to fall off. *Id.* at ¶ 100.  Smith apparently tried to turn around to pick up the shoe, but another officer tightly gripped Smith's waist chain and ordered Smith to face forward. *Id.*

First, as for Burri's comments to Smith and his laughing at another officer's comments, it is well-settled that verbal harassment by a corrections official is not a constitutional violation. *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986); *Jones v. Harris*, 665 F. Supp. 2d 384, 396 (S.D.N.Y. 2009).  Accordingly, the claims related to Burri's comments to Smith and his laughing at another officer's comments are dismissed.

Second, Burri stepping on the back of Smith's shoe does not rise to the level of a constitutional claim.  *Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000) ("[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.").  This is especially true as Smith has not alleged that he suffered "discernible injury" from the incident. *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010)

Finally, the Court notes that to the extent Smith is trying to hold Burri liable for

participating in an incident where another officer tightened Smith's waist chain, that allegation is

also not actionable.  It is a general rule in this Circuit that in a prison setting, an assertion that an

official tightened handcuffs or waist chains is insufficient to support an excessive force claim

"unless it causes some injury beyond temporary discomfort." *Lynch ex rel. Lynch v. City of*

*Mount Vernon*, 567 F.Supp.2d 459, 468 (S.D.N.Y. 2008); *Rosenberg v. Coon*, No. 12 CV 3803

VB, 2013 WL 1223516, at \*3 (S.D.N.Y. Mar. 27, 2013) (treating as legally equivalent the

tightening of handcuffs and the tightening of waist chains).  Here, Smith has not even alleged

that he suffered temporary discomfort from the waist-chain tightening incident.  Accordingly, the

claim against Burri related to waist-chain tightening on December 30, 2011 is also dismissed.

For the reasons above, Burri's motion to dismiss is GRANTED.

### G. Defendant Colvin

Defendant Colvin is the Deputy Superintendent for Security at Five Points.  Colvin is a

supervisory official, and Smith makes a variety of allegations against Colvin in his supervisory

capacity.

First, Smith alleges that he filed a grievance on December 21, 2011 regarding a nurse

failing to wear gloves while pouring his nutritional supplement into a Styrofoam cup.  ECF No. 1

at ¶¶ 78–79.  Colvin apparently responded to the grievance as follows: "The investigation reveals

that the pouring of Jevity [nutritional supplement] into a styro-foam cup does not require the use

of a sterile procedure.  The grievant has the right to refuse the Jevity.  Grievance [d]enied." *Id.* at

¶ 79.

Second, Smith alleges that he filed a grievance on January 6, 2012 regarding a

"destructive cell search." *Id.* at ¶ 113.  Smith further alleges, without any elaboration, that

Colvin denied the grievance. *Id.*

Third, Smith alleges that he wrote a letter to Defendant Sheahan, another supervisory official, on January 30, 2013 regarding his request for a kosher diet. *Id.* at ¶ 141. Sheahan apparently forwarded the letter to Colvin, who then forwarded the letter to another official. *Id.* That offical then responded to Smith unfavorably. *Id.*

As for the first allegation, Smith has adequately alleged that Colvin was personally involved in the underlying incident. In short, Smith alleges that Colvin responded to Smith directly about his grievance regarding a nurse not wearing gloves while handling a nutritional supplement. In his response, Colvin allegedly indicated that he had conducted an "investigation" into the nurse not wearing gloves. That is enough to establish Colvin's personal involvement in the incident at this stage. *See Walker v. Pataro*, No. 99CIV.4607(GBD)(AJP), 2002 WL 664040, at *13 (S.D.N.Y. Apr. 23, 2002) ("[W]here a supervisory official receives and acts on a prisoner's grievance (or substantively reviews and responds to some other form of inmate complaint), personal involvement will be found . . . .").

Smith has not, however, alleged any Eighth Amendment claim underlying the grievance in question. Construed liberally, Smith is attempting to a state a claim for inadequate medical care. Such a claim must satisfy (1) an objective component, where "the alleged deprivation of adequate medical care must be sufficiently serious," and (2) a subjective component, where the "official must act with a sufficiently culpable state of mind." *Salahuddin*, 467 F.3d at 279 (citations and internal quotations omitted).

To satisfy the objective prong on a motion to dismiss, an inmate typically must allege that he suffered some actual harm due to the inadequate medical care. *See Goolsby v. Cicconi-Crozier*, No. 13-CV-822-A, 2014 WL 1279066, at *4 (W.D.N.Y. Mar. 27, 2014) ("[P]laintiff's

allegations fail to satisfy the objective component of a deliberate indifference claim because he does not allege that any actual harm resulted . . . ."). *Salahuddin*, 467 F.3d at 280. At the very least, the inmate can satisfy the objective prong by alleging that future harm was likely or "very likely" to result from the inadequate care. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993). Here, Smith has not anywhere alleged that he suffered actual harm from a nurse not wearing gloves while handling his nutritional supplement; he also has not alleged that he was likely to suffer any future harm from the nurse not wearing gloves. Smith has merely alleged that the nurse's "completely bare" hands were "germ infested" as a result of the nurse "rub[bing] his face and eyes" and touching other prisoners' medications. ECF No. 1 at ¶ 79. This is not nearly enough to show that the care Smith received was objectively inadequate. Accordingly, there is no underlying constitutional deprivation related to the grievance filed on December 21, 2011, and thus, that claim against Colvin is dismissed.

As for Smith's other allegations against Colvin, Smith has not adequately alleged Colvin's personal involvement in any underlying deprivation. Smith alleges in one instance that Colvin denied his grievance relating to a destructive cell search. Smith has not, however, provided any further detail about Colvin's denial of the grievance. Without any allegation that Colvin looked into the matters raised in the grievance or responded to the grievance in detail, Smith has not established that Colvin was personally involved in the cell search. *See McClenton v. Menifee*, No. 05 CIV.2844(JGK), 2006 WL 2474872, at *10 (S.D.N.Y. Aug. 22, 2006) ("[A] supervisor's mere denial of a grievance is insufficient to establish personal involvement . . . ."); *see also Brooks v. Chappius*, 450 F. Supp. 2d 220, 226 (W.D.N.Y. 2006) ("[W]hile there is some authority from within this circuit that a supervisory official's denial of a grievance can suffice to show personal involvement, in general personal involvement will not be found unless the

supervisor's response is detailed and specific . . . .") (internal citations and quotations omitted).

Similarly, Colvin's forwarding of Smith's letter about a kosher diet to another official does not show that Colvin was personally involved in the underlying incident. *See supra* Part IV.C; *Rivera*, 655 F. Supp. 2d at 238 ("[I]f an official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter."). In short, the claims regarding Colvin's involvement in both the destructive cell search and Smith's kosher diet are also dismissed.

For the reasons stated above, Colvin's motion to dismiss is GRANTED.

### *H. Defendants Crance and O'Connor*

Defendants Crance and O'Connor are corrections officials at Five Points. Smith alleges that on May 23, 2012, Crance and O'Connor came to Smith's cell to take him to a disciplinary hearing and to see a nurse. 6208, ECF No. 1 at ¶ 75. The officials first shackled Smith's ankles (*id.*), which Smith contends they were not authorized to do (*id.* at ¶ 78). They then asked Smith to put his arms through the slot of his cell door to be handcuffed. *Id.* at ¶ 75. After Smith put his hands through the food slot, Smith, by his own admission, "refused to be placed into handcuffs and . . . refused to pull his arms back into his cell to allow N.Y.S. DOCCS staff to shut his food slot hatch." *Id.* O'Connor subsequently grabbed Smith's arm and both O'Connor and Crance "used force on the plaintiff and began to pull the plaintiff[']s right arm through the feed up slot in the plaintiff[']s cell door." *Id.* at ¶ 76. Crance and O'Connor then brought Smith to the nurse, who "documented the plaintiff[']s injuries on a medical entry form" yet cleared Smith without ever filing an official injury report. *Id.* at ¶¶ 76–77.

Smith further alleges that O'Connor fabricated a misbehavior report regarding the

24

incident. *Id.* at ¶ 79. O'Connor's allegedly false report stated that O'Connor and Crance grabbed Smith's arm because Smith made an "aggressive movement" towards the officers with his arm. *Id.* The misbehavior charge resulting from this report was apparently later dismissed by a hearing officer. *Id.*

The Court first addresses the excessive force claim against both O'Connor and Crance. A claim for excessive force requires a showing that (1) "the conduct was objectively harmful enough or sufficiently serious to reach constitutional dimensions," and (2) "the defendant acted with a subjectively sufficiently culpable state of mind." *Harris*, 2016 WL 963904 at *10–12. (citations and internal quotations omitted). The clear implication from this standard is that "not . . . every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). In short, *de mimimis* uses of force do not support excessive force claims. *Id.* at 9–10.

The force used here, which amounts to a pull of an arm, was *de minimis*. *See, e.g.*, *Brown v. Busch*, 954 F. Supp. 588, 597 (W.D.N.Y. 1997) (holding that officers who "pushed, shoved and struck [inmate] while forcing him back into his cell" used *de minimis* force); *DeArmas v. Jaycox*, No. 92 CIV. 6139 (LMM), 1993 WL 37501, at *1, 4 (S.D.N.Y. Feb. 8, 1993), *aff'd*, 14 F.3d 591 (2d Cir. 1993) (holding that force used was *de minimis* where officers punched inmate in the arm and kicked him in the leg, causing the inmate to fall down); *Anderson v. Sullivan*, 702 F. Supp. 424, 427 (S.D.N.Y. 1988) (holding that officers did not use excessive force when they pulled inmate's arms behind his back and pushed his face into cell bars). Notably, Smith has not alleged that he suffered any specific injury from the arm grab; he makes only a vague reference to "injuries" in alleging that the nurse "only documented the plaintiff[']s injuries on a medical entry form" instead of an "inmate injury report." 6208, ECF No. 1 at ¶ 76

(internal quotations omitted).   This sort of bare, conclusory allegation need not be credited on a motion to dismiss.  *See Iqbal*, 556 U.S. at 680.

Moreover, Smith admits that the arm-grabbing incident was triggered by his refusal to allow O'Connor and Crance to handcuff him.  In other words, the arm grab was quite clearly not the result of malice, but rather the result of a "good faith effort to maintain or restore discipline." *Hudson*, 503 U.S. at 6 (citations and internal quotations omitted).  Accordingly, the force used was by no means excessive, and the claim that arises out of it against Crance and O'Connor is dismissed.

As for Smith's allegation that O'Connor and Crance did not have the proper authorization to place him in foot shackles, this allegation does not support any sort of constitutional claim. The Court observes that as a general matter, prison officials are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (1992) (citations and internal quotations omitted).  The decision by officials to place an inmate in foot shackles for a walk down the hall certainly does not implicate constitutional rights.

Finally, the Court briefly addresses Smith's allegation that O'Connor filed a false report in connection with the arm-grabbing incident.  In short, the law is clear that "the issuance of false misbehavior reports against an inmate by corrections officers is insufficient on its own to establish a denial of due process." *Sital v. Burgio*, 592 F. Supp. 2d 355, 357 (W.D.N.Y. 2009) (citations and internal quotations omitted); *see also Moore v. Casselberry*, 584 F. Supp. 2d 580, 582 (W.D.N.Y. 2008) ("There is no basis for a constitutional claim alleging the mere filing of a false report.").  An inmate may, however, maintain a claim against an official for filing a false report if (1) he "was disciplined without adequate due process, as a result of the report," or (2)

"the report was issued in retaliation for exercising a constitutionally protected right." *Sital v.*
*Burgio*, 592 F. Supp. 2d 355, 357 (W.D.N.Y. 2009). Here, Smith has failed to make any
allegation that satisfies either prong. As for the first prong, Smith acknowledges that the charge
resulting from the allegedly false report was later dismissed and, thus, he was not disciplined for
the incident. As for the second prong, Smith has not at all alleged that O'Connor issued the false
report with a retaliatory motive.

For the reasons above, Crance's motion to dismiss is GRANTED. Additionally, although
O'Connor did not file a motion to dismiss, the Court *sua sponte* dismisses the claims against him
with prejudice.

### I. Defendants Fischer and Lempke

Defendant Fischer was the Commissioner of DOCCS during Smith's incarceration at
Five Points. Defendant Lempke was the Five Points Superintendent when Smith arrived at Five
Points.

Smith's allegations against these two defendants are straightforward. Smith alleges that
he sent numerous written complaints to Fischer and Lempke. ECF No. 1 at ¶ 54, 133. These
letters generally concerned "physical abuse, medical neglect and staff mistreatment" (*id.* at ¶
133) as well Smith's allegedly inadequate diet (*id.* at ¶ 54). Smith alleges that Fischer and
Lempke simply forwarded the letters to other officials without investigating the complaints
themselves. *Id.* at ¶ 54, 133.

These allegations are not enough to show that either Fischer or Lempke were personally
involved in the underlying deprivations. An official does not become personally involved in the
matters raised in a prisoner's written complaint by simply forwarding the complaint to a
subordinate. *See Rivera*, 655 F. Supp. 2d at 238; *supra* Part IV.C; Part IV.G. Accordingly,

Smith has not stated a § 1983 claim for damages related to the matters in these letters against either Fischer or Lempke.

Additionally, to the extent Smith is seeking to hold Fisher and Lempke liable for simply failing to investigate his complaints, the law is settled that "that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *McCloud*, 55 F. Supp. 3d at 481. (citations and internal quotations omitted). Accordingly, any claim based on a failure to investigate is dismissed.

For these reasons, Fischer and Lempke's motions to dismiss are GRANTED.

*J. Defendant Levac*

Defendant Levac is a Five Points official who acted as the hearing officer in one of Smith's disciplinary proceedings. Levac apparently found Smith guilty of cursing at a nurse on May 22, 2012, and thus he sentenced Smith on June 5, 2012 to an "additional 30 days of keeplock cell confinement,[10] [and] 30 days loss of commissary, package and phone privileges." ECF No. 1 at ¶¶ 84, 89. The Court notes here that it is unclear what Smith means by his assertion that he was sentenced to an "*additional* 30 days" of keeplock confinement. *Id.* at ¶ 89 (emphasis added). Construed in its strongest (that is, harshest) possible terms, Smith means that he was placed in keeplock immediately following the incident on May 22, 2012, and then Levac sentenced him to an *additional* 30 days in keeplock on June 5, 2012.

Smith appears to allege that during the disciplinary hearing, Levac violated his rights by crediting false testimony. *Id.* at ¶¶ 85–88. For context, the supposedly false testimony relates to a peripheral issue—at the hearing, Smith and two nurses disputed whether the nurse in question, before arriving at Smith's cell, touched a neighboring inmate's infection without wearing gloves.

---

[10]     "Keeplock" or "Keep Lock" generally refers to confinement where an inmate is locked in his cell for 23 hours per day.

*Id.* at ¶¶ 81–88.

Construed liberally, Smith is arguing that Levac did not grant him due process at the disciplinary hearing. In evaluating an inmate's due process claim when the punishment is segregated confinement within prison, a court must consider "(1) whether the plaintiff had a protected liberty interest in not being [so] confined and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law." *Tellier v. Fields*, 280 F.3d 69, 79–80 (2d Cir. 2000) (citations, internal quotations, and internal alterations omitted).

As for the first prong, a court determines whether a plaintiff has a protected liberty interest by looking at "how long the confinement lasted, along with the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population." *Nieves v. Prack*, --- F. Supp. 3d ---, No. 6:15-CV-06101 EAW, 2016 WL 1165820, at *3 (W.D.N.Y. Mar. 24, 2016) (citations and internal quotations omitted). "Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999) (internal citation omitted).

There is no bright-line duration of time in segregated confinement that qualifies as a loss of a protected liberty interest. *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). However, the Second Circuit has held that confinement for fewer than 101 days, under normal keeplock or special housing unit ("SHU")[11] conditions, does not qualify as an "atypical and significant hardship" that implicates due process. *Sealey*, 197 F.3d at 589 (citations and internal quotations omitted); *see also Tafari v. McCarthy*, 714 F. Supp. 2d 317, 375 (N.D.N.Y. 2010) (observing that SHU confinement of 90 days or less implicates a liberty interest only if the conditions are

---

[11] SHU confinement is another form of segregated confinement where an inmate is typically locked in his cell for 23 hours per day.

more severe than normal SHU conditions).   Moreover, there is broad agreement in this Circuit

that "that keeplock or SHU confinement of 30 days or less in New York prisons" does not

implicate due process. *Williams v. Keane*, No. 95 CIV. 0379 AJP JGK, 1997 WL 527677, at *6

(S.D.N.Y. Aug. 25, 1997) (Peck, M.J.) (collecting cases).

Here, Smith appears to allege that as a result of the flawed disciplinary proceeding, he

was sentenced to keeplock for 30 days, and he lost his "commissary, package and phone

privileges" for the same amount of time. ECF No. 1 at ¶ 89.  These allegations are not enough

to support a due process claim because, in short, 30 days in keeplock generally does not qualify

as the loss of a protected liberty interest.  Furthermore, Smith has not made any sort of allegation

that his 30 days in keeplock were characterized by "especially harsh conditions." *Sealey*, 197

F.3d at 586.  He has merely alleged that the confinement was coupled with the loss of some other

minor privileges that are typically associated with general population confinement.  Accordingly,

Smith's due process claim must fail.

The Court makes one additional note to this analysis.  Even if Smith, in alleging that he

was sentenced to an "*additional* 30 days" of keeplock confinement *(id.* at ¶ 89 (emphasis

added)), means that he was already in keeplock for the incident at the time of the hearing, the

conclusion here would be the same.  To restate the relevant timeline, Smith allegedly cursed at

the nurse on May 22, 2012 and the ensuing disciplinary hearing took place on June 5, 2012.

ECF No. 1 at ¶¶ 84, 89.  Accordingly, interpreting Smith's "additional 30 days" allegation in the

strongest (or harshest) possible light, Smith was placed in keeplock for the nurse-cursing incident

on the very day he cursed at the nurse, May 22, 2012.  He then remained in keeplock until his

June 5, 2012 hearing, where he was sentenced to an "additional 30 days" in keeplock.  This

would mean he stayed in keeplock for 44 days as a result of cursing at a nurse.  Even assuming

this were true, a 44-day confinement still would not qualify as the loss of a protected liberty

interest. Once again, courts generally treat 100 days of segregated confinement as the lower

bound for triggering a protected liberty interest. *See Sealey*, 197 F.3d at 589; *Palmer v.*

*Richards*, 364 F.3d 60, 64–65 (2d Cir. 2004) (observing that when inmates are confined to SHU

or keeplock for an "intermediate duration," *i.e.*, "between 101 and 305 days," courts must take a

close look at a "detailed record of the conditions of the confinement" to determine whether a

liberty interest is implicated) (citations and internal quotations omitted). Accordingly, in light of

the fact that Smith has not alleged that his stay in keeplock confinement was unusually harsh, a

44-day keeplock confinement still does not implicate due process rights.

For the reasons above, Smith has not stated a due process claim against Levac, and thus

Levac's motion to dismiss is GRANTED.

### K. Defendant Mosko

Defendant Mosko is a corrections official at Five Points. Defendants' counsel has

understandably missed Smith's allegations against Mosko in the morass of the complaints,

arguing that Mosko should be dismissed because "[a]s best Defendants can determine, . . .

[Mosko] is not alleged to have committed any wrongdoing." ECF No. 36-1. The Court directs

defendants' counsel to paragraphs 99–100 of the complaint filed in the 6:12-cv-6208 action.

Here, Smith alleges that he was beaten by Mosko and another officer. 6208, ECF No. 1 at ¶ 99–

100.

Mosko's motion to dismiss is DENIED.

### L. Defendant Parish

Defendant Parish is a corrections official at Five Points. Smith makes a variety of

allegations against him.

First, Smith alleges that on October 8, 2011, Parish instituted an "in cell water deprivation" by shutting off Smith's in-cell sink and toilet water. ECF No. 1 at ¶ 58. Parish apparently shut off Smith's cell water because Smith was accused of flooding his cell earlier that day. *Id.* at ¶ 59. Smith further asserts that Parish did not provide him with either a "formal misbehavior report" or a hearing before shutting off his water. *Id.* As a result of both the in-cell water deprivation and his ongoing dietary issues, Smith alleges that he "physically deteriorate[d] from severe malnutrition and dehydration." *Id.* at ¶ 60. Furthermore, while Smith appears to allege in the complaint that his water was only shut off for one day (*id.* ¶ 59 ("The imposition of this 10-8-2011 in cell water deprivation . . . violated the plaintiff[']s 8th Amendment . . . rights . . . .")), Smith notes in his reply papers that while he does not exactly know how long his in-cell water was turned off, it was for "a lot longer than just [a] twenty four hour period." ECF No. 38 at 4.

Second, Smith alleges that on December 30, 2011, while Parish and other officers were escorting Smith back to his cell, Parish said, "Smith! Whenever I jerk off all my fluids come out of my dick and I get dehydrated."[12] *Id.* at ¶ 99. Parish and the other officers then laughed at this comment.

Finally, Smith alleges that on January 18, 2012, two officers came to his cell to take him to the infirmary. 6208, ECF No. 1 at ¶ 44. One of the officers allegedly squeezed Smith's waist chain in an excessively tight manner, and then pushed Smith into a cell door. *Id.* at ¶ 48. Parish responded to the scene, and Smith told Parish that his waist chain was too tight. *Id.* at ¶ 50. Parish checked the waist chain and "disregarded" Smith's complaint. *Id.*

As for the allegations related to Parish shutting off Smith's water, Smith appears to be

---

[12]   This incident was previously detailed with respect to Defendant Burri, *see supra* Part IV.F.

making both a conditions-of-confinement claim and a due process claim. Each claim is addressed in turn.

With regard to the conditions-of-confinement claim, as the Court has already indicated, Smith must allege that (1) the deprivation was objectively serious in that Smith was "denied the minimal civilized measure of life's necessities," and (2) Parish acted with deliberate indifference to Smith's health and safety. *Walker*, 717 F.3d at 125 (citations and internal quotations omitted).

Here, Smith has failed to allege that the in-cell water deprivation was an objectively serious deprivation. In a Northern District of New York case that also addressed an inmate's temporary loss of in-cell water privileges, the court stated that "[n]owhere has it been held that prisoners are entitled to complete and unfettered access to water or showers." *Beckford v. Portuondo*, 151 F. Supp. 2d 204, 211 (N.D.N.Y. 2001) (holding that a six day suspension of in-cell water privileges, instituted after the prisoner had flooded his cell, did not constitute an objectively serious deprivation); *see also Johnson v. Comm'r of Corr. Servs.*, 699 F. Supp. 1071, 1072–74 (S.D.N.Y. 1988) (holding that an in-cell sink that was inoperable for nine days did not establish a conditions-of-confinement claim under the Eighth Amendment). The Court stands by this statement. Notably, Smith has not at all alleged that he was without access to water for any period of time; he has merely alleged that his *in-cell water* was turned off after he was accused of flooding his cell. This sort of deprivation does not constitute a denial of the "minimal civilized measure of life's necessities." *Walker*, 717 F.3d at 125 (citations and internal quotations omitted). Accordingly, the conditions-of-confinement claim against Parish related to the in-cell water deprivation is dismissed.

Furthermore, Smith has failed to state any sort of due process violation with regard to the

in-cell water deprivation.  Once again, as a threshold matter, a valid due process claim requires the loss of a "protected liberty interest." *Tellier*, 280 F.3d at 79–80 (citations and internal quotations omitted).  A "protected liberty interest" is, in turn, implicated if the alleged deprivation was "atypical and significant." *Id.*  Here, the Court determines that Smith did not have a protected liberty interest in continuous, uninterrupted access to running water in his cell. *See Beckford*, 151 F. Supp. 2d at 219 ("In light of the minimal amount of time that Plaintiff's dietary, water, and plastic shield restrictions were put in place, the Court holds, as a matter of law, that his confinement was not sufficiently atypical to implicate a protected liberty interest."). Considering that there is a broad agreement in this Circuit that 30 days in segregated confinement—which typically means the inmate is locked in a cell for 23 hours a day—does not qualify as the loss of a protected liberty interest (*see supra* Part IV.J), the brief loss of in-cell water privileges certainly does not qualify as the loss of a protected liberty interest. Consequently, Smith was not entitled to due process before Parish shut off his in-cell water, and thus his due process claim fails.

As for Smith's allegation that Parish made a lewd comment toward him, the Court has already observed that verbal harassment by a corrections official is not a constitutional violation. *See Purcell*, 790 F.2d at 265; *supra* Part IV.F.

Similarly, as for the tightening of Smith's waist chain, the Court has also previously explained that the the tightening of handcuffs and waist chains does not support an excessive force claim unless the tightening causes injury beyond temporary discomfort. *See Rosenberg*, 2013 WL 1223516 at *3, *supra* Part IV.F.  Smith has not alleged that he suffered any injury from the waist-chain tightening on January 18, 2012.

For the foregoing reasons, Parish's motion to dismiss is GRANTED.  Notably, Parish did

not specifically move to dismiss the claim regarding his involvement in the tightening of Smith's

waist chain on January 18, 2012.  The Court *sua sponte* dismisses that claim with prejudice.

### *M. Defendant Piccolo*

Defendant Piccolo is a corrections official at Five Points.

The allegations against Piccolo revolve around Smith's dietary issues.  Smith first alleges

that a supervisory official, L. Jones, approved his request for a kosher diet on January 30, 2013.

ECF No. 1 at ¶ 141.  He next alleges that even though this request was approved on January 30,

corrections officers did not immediately serve him with the diet.  ECF No. 1 at ¶ 141.

Accordingly, Smith wrote a letter of complaint, presumably on January 30, to an official who

soon forwarded the letter to Piccolo.  *Id.*  Piccolo wrote back to Smith in a February 6, 2013

memorandum, saying that Smith's kosher-diet request "was still pending approval from the

Deputy Superintendent of Programs." *Id.*  Smith then began receiving the kosher diet on

February 8, 2013.  ECF No. 1 at ¶ 146.

Construed liberally, Smith is attempting to state a First Amendment claim against Piccolo

for the delay in serving him a kosher diet.  There is a colorable basis for such a claim.  The

Second Circuit has long recognized that the right of the people to freely exercise religion under

the First Amendment includes "the right of prisoners to receive diets consistent with their

religious scruples." *Kahane v. Carlson*, 527 F.2d 492, 495–96 (2d Cir. 1975).  Therefore, an

inmate is "entitled to a reasonable accommodation of his . . . religious dietary practices."

*Davidson v. Murray*, No. 92-CV-0283C, 2005 WL 1123756, at *3 (W.D.N.Y. May 10, 2005).

Traditionally, an inmate establishes a violation of his free exercise rights by showing "[1]

that he has a sincerely held religious belief, [2] that it was substantially burdened, and [3] that

defendants' conduct was not reasonably related to some legitimate penological interest." *Barnes v. Furman*, 629 F. App'x 52, 55 (2d Cir. 2015).

Notably, the Second Circuit has recently observed that it is actually an open question whether an inmate must still show that the challenged practice "substantially burdened" his religious beliefs. *See Barnes*, 629 F. App'x at 55 n.3. ("We have not decided whether the substantial burden test remains viable in our Circuit . . . ."). However, the Second Circuit has also noted that even "[r]ejecting the substantial burden test" would not mean that "every possible restriction on religious practices is a violation" of free exercise rights. *McEachin v. McGuinnis*, 357 F.3d 197, 203 n.6 (2d Cir. 2004). In other words, regardless of whether the prong still applies, *de minimis* violations of free exercise rights are not actionable under § 1983. *See id.*

In this vein, district courts in this Circuit have found that where a delay in serving an inmate a religious diet is brief and caused by "typical and acceptable institutional delay," the inmate's religious rights are not violated. *Davidson*, 2005 WL 1123756 at *4 (citations and quotations omitted) (finding that a 10-day delay in receiving a religious diet after the inmate transferred prisons did not violate free exercise rights); *Tapp v. Stanley*, No. 04-CV-6400 CJS, 2008 WL 4934592, at *1,7 (W.D.N.Y. Nov. 17, 2008) (finding that a 77-day delay in inmate receiving a special diet that was caused by administrative processing did not violate religious rights); *see also Dove v. Broome Cnty. Corr. Facility*, No. 9:10-CV-0002 DNH/DEP, 2011 WL 1118452, at *2, 8–9 (N.D.N.Y. Feb. 17, 2011), *report and recommendation adopted*, No. 9:10-CV-02, 2011 WL 867072 (N.D.N.Y. Mar. 10, 2011) (finding that a 30-day discontinuance of a kosher diet after inmate violated policy by eating non-kosher food did not violate free exercise rights). This is understandable as prison officials, while accommodating the beliefs of inmates,

are also "charged with complex duties arising from administration of the penal system." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citations and internal quotations omitted).

Here, Smith has effectively attempted to hold Piccolo liable for causing, at most, a nine-day delay in the distribution of his kosher diet. To restate the relevant allegations, Smith alleges that he wrote to Piccolo on January 30, 2013 about not receiving his kosher diet. Piccolo wrote back on February 6, 2013, apparently believing that Smith's request was still pending approval. In any event, Smith then received his kosher diet on February 8, 2013, nine days after he wrote the letter that reached Piccolo. Notably, before January 30, 2013, there is no indication that Piccolo had any knowledge of Smith's request for a kosher diet, so that delay cannot be attributed to Piccolo. In short, this brief nine-day delay caused by Piccolo, without any kind of allegation that it was more than a reasonable processing-related delay, is the sort of *de minimis* deprivation that does not implicate the First Amendment.

For these reasons, Piccolo's motion to dismiss is GRANTED.

### N. Defendant Seidel

Defendant Seidel is a corrections official at Five Points. Smith first alleges that on April 2, 2012, Seidel and another officer placed Smith on a "shaving razor deprivation order." ECF No. 1 at ¶ 112. Thus, Smith could not shave for over a month. *Id.*

Second, Smith alleges that on October 5, 2011, Seidel wrote Smith a misbehavior report after Smith, by his own admission, urinated on his cell floor. *Id.* at ¶ 139. Smith then alleges that Seidel did not provide him with any cell-cleaning supplies in order to clean up the urine for two days, so Smith and his neighboring inmates were "fed [their] breakfast, [l]unch and dinner meals with the lingering odor of urine in the air, from the uncleaned urine in front of the plaintiff[']s cell and on the plaintiff[']s cell floor." *Id.*

37

As for the claim regarding Seidel's failure to provide Smith a razor for shaving, this is the sort of *de minimis* deprivation that does not concern the Constitution. *See, e.g., McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003) ("[A] failure to provide razors for shaving [does not] rise to the level of constitutional concern).

Smith has also attempted to state a conditions-of-confinement claim arising out of Smith urinating on his cell floor. As for such a claim related to the exposure to waste, the Court observes a distinction in this Circuit between an inmate's "continuous and chronic exposure to waste" versus "intermittent or brief exposure." *Ortiz v. Dep't of Corr. of City of New York*, No. 08 CIV. 2195 RJSHBP, 2011 WL 2638137, at *8 (S.D.N.Y. Apr. 29, 2011), *report and recommendation adopted sub nom. Ortiz v. Hernandez*, No. 08 CIV. 2195 RJSHBP, 2011 WL 2638140 (S.D.N.Y. July 5, 2011). Chronic exposure to waste qualifies as an objectively serious condition that implicates the Eighth Amendment. *See Gaston*, 249 F.3d at 165 (vacating summary judgment where plaintiff asserted that for "several consecutive days . . . his cell was filled with human feces, urine and sewage water"); *LaReau v. MacDougall*, 473 F.2d 974, 977–79 (2d Cir. 1972) (finding that inmate who spent five days in small cell that contained only a grate-covered hole in the floor for a toilet was deprived of Eighth Amendment rights). On the other hand, brief or intermittent exposure to waste does not does not qualify as an objectively serious condition. *See Ortiz*, 2011 WL 2638137 at *8 (dismissing claim where inmate was exposed to "sewage overflow" on the three separate occasions but for "probably less than 24 hours" total time); *Evans v. Fogg*, 466 F.Supp. 949, 950 (S.D.N.Y. 1979) ("To be kept in a refuse-strewn cell for 24 hours and in a flooded cell (a condition resulting from [plaintiff's] own acts) for two days is a rough experience, but, since neither condition persisted for more than a limited period of time, it cannot be said that the condition amounted to cruel and unusual

punishment.").

After comparing the postures of these cases to the facts at hand, it is apparent that Smith's exposure to his own urine for two days is the type of brief or intermittent exposure to waste that fails to satisfy the objective element of a conditions-of-confinement claim. Bolstering this conclusion is the fact that Smith has failed to allege that he suffered any harm or health problems from the condition.

For these reasons, Seidel's motion to dismiss is GRANTED.

### O. Defendants Scranton and Trombly

Defendants Scranton and Trombly are corrections officials at Five Points. Smith alleges that on March 20, 2012, a nurse at Five Points diagnosed him with dehydration, placed him on "'hunger strike' observation," and ordered that he be sent to the infirmary. ECF No. 1 at ¶ 73 (internal quotations in original). Smith then went to the infirmary where another nurse allegedly failed to "provide [him] with any fluids or nourishment." *Id.* Officers Scranton and Trombly subsequently "had the plaintiff discharged from the medical infirmary and sent back to his [mental health unit] cell without any proper medical clearance." *Id.*

Construed liberally, Smith is making a claim against Scranton and Trombly for deliberate indifference for discharging him from the infirmary. In general, to state a claim for medical indifference, Smith must allege that (1) objectively, the deprivation of medical care was sufficiently serious, and (2), subjectively, the officials in question acted with deliberate indifference to his health. *Salahuddin*, 467 F.3d at 279–80.

Here, Scranton and Trombly are both non-medical personnel. As the Supreme Court has noted, deliberate indifference by non-medical personnel is manifested by "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once

prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).

On the allegations in the complaint, Smith has not sufficiently pled that Scranton or Trombly denied or delayed access to medical care or otherwise interfered with a prescribed course of treatment. They certainly did not deny or delay access to care—Smith was sent promptly to the infirmary for his dehydration where a nurse on duty apparently decided he was not in need of immediate care. Only at this point did Scranton and Trombly discharge him from the infirmary. They also did not interfere with any course of treatment—once again, there was no immediate course of treatment. The Court also notes that to the extent that Smith's placement on "hunger strike observation" is a form of care or course of treatment, Scranton and Trombly also did not at all interfere with that treatment—upon Smith's discharge from the infirmary, he returned to the mental health unit of the prison (*id.* at ¶ 74) where he remained on hunger-strike status until the next month, April 2012 (*id.* at ¶ 72). In short, Smith has not shown that Scranton or Trombly were deliberately indifferent to either his dehydration on March 20, 2012 or his hunger-strike status.

Thus, Scranton and Trombly's motions to dismiss are GRANTED.

*P. Defendant Sheahan*

Defendant Sheahan is the Superintendent at Five Points. Smith makes various allegations against Sheahan in his supervisory capacity.

First, Smith alleges that he filed a grievance regarding an incident of "physical abuse and torture" that he suffered at Five Points on November 2, 2012. *Id.* at ¶ 130. Sheahan apparently "took no action to investigate" this grievance *Id.* Similarly, Smith alleges that he filed "numerous" grievances regarding his inadequate diet. ECF No. 1 at ¶ 64. He notes, without elaboration, that Sheahan and the grievance committee denied all of these grievances. *Id.*

The Court addresses these allegations in short order.  Smith has not sufficiently alleged that Sheahan was personally involved in any of the alleged deprivations raised in these grievances.  First, it is well-settled that the "receipt of a letter or grievance, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement." *Jones v. Fischer*, No. 9:11-CV-774 GLS/CFH, 2013 WL 4039377, at *10 (N.D.N.Y. Aug. 7, 2013).  Similarly, a supervisor's denial of a grievance—without any further allegation that the supervisor provided a detailed or specific response to the prisoner—is generally not enough to establish personal involvement. *See Brooks*, 450 F. Supp. 2d at 226; *supra* Part IV.G.  Without personal involvement, there can be no damages award under § 1983. *See Gaston*, 249 F.3d at 164.  Accordingly, to the extent Smith is trying to hold Sheahan personally responsible under § 1983 for matters raised in these grievances, those claims are dismissed.

The Court also notes that to the extent Smith is attempting to state a due process claim based on Sheahan "t[aking] no action to investigate" his grievance, that claim is also dismissed. In short, "[i]t is well established . . . that inmate grievances procedures are undertaken voluntarily by the states, that they are not constitutionally required, and accordingly  that a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim." *Swift v. Tweddell*, 582 F. Supp. 2d 437, 445–46 (W.D.N.Y. 2008).  In other words, Sheahan had no responsibility under the Constitution to investigate Smith's grievances.

The rest of Smith's allegations against Sheahan are also straightforward.  Smith alleges that on June 5, 2012, he was found guilty at a disciplinary hearing for cursing at a nurse.  ECF No. 1 at ¶¶ 81–89, *see supra* Part IV.J.  Smith appealed the decision to Sheahan, who forwarded

it to another official, who then affirmed the decision. ECF No. 1 at ¶ 90. Similarly, Smith

alleges that he wrote a letter to Sheahan in 2013 regarding his kosher-diet request. *Id.* at ¶ 141.

Sheahan forwarded the letter to another official, who responded unfavorably to Smith. *Id.*, *see*

*supra* Part IV.M.

As the Court previously explained, the fact that Sheahan forwarded a disciplinary

decision or correspondence to another official also does not establish that he was personally

involved in the underlying matters. *See Rivera*, 655 F. Supp. 2d at 238; *supra* Part IV.C, Part

IV.G; Part IV.I. Accordingly, he cannot be liable for damages for these matters under § 1983.

*See Gaston*, 249 F.3d at 164. Thus, these claims against Sheahan are also dismissed..

For the reasons stated above, Sheahan's motion to dismiss is GRANTED.

### *O. Defendant Terry*

Defendant Terry is a corrections official at Five Points. Smith's first allegation against

Terry is that he, along with three other officers, failed to fix Smith's toilet in December 2011.

ECF No. 1 at ¶¶ 102–05. The Court already discussed this incident in Part IV.A and dismissed

the conditions-of-confinement claims against the three other officers involved. For the same

reasons, it now dismisses the conditions-of-confinement claim against Terry. *See supra* Part

IV.A. In short, all of the officers appear to have been quite diligent, as opposed to indifferent, in

dealing with the broken toilet.

Smith references Terry in one other incident. By way of brief background, Smith alleges

that on November 2, 2012, he fell unconscious behind his cell toilet. ECF No. 1 at ¶ 123.

Multiple officers allegedly dragged Smith out from behind the toilet and "shoved" his face into

the floor. *Id.* at ¶ 124. A nurse then "shoved one smelling salt packet up each one of the

plaintiff's nostrils." *Id.* at ¶ 126. Smith alleges that he suffered a bloody nose and "visible facial

injuries" from the incident. *Id.* at ¶¶ 127–28. Immediately following the incident, he was taken to the infirmary where the nurse cleaned his bloody nose and conducted a brief checkup. ECF No. 1 at ¶ 127; 38-2 at 49.

As for Terry's involvement, Smith alleges that after he was discharged from the infirmary later that day, he informed Terry about the "physical abuse" he had just endured. *Id.* at ¶ 128. Terry, however, "refused to take the plaintiff[']s complaint of physical abuse seriously and refused to have photographs taken of the plaintiff[']s face." *Id.*

As an initial observation, it is unclear what exactly Smith means by his assertion that Terry "refused to take [his] complaint of physical abuse seriously." *Id.* If Smith means that Terry ignored his injuries and thus Smith was denied adequate medical care following the incident, that is contradicted by both the complaint and by the exhibits Smith attached to his response to the motion to dismiss. In short, Smith received prompt medical care after the incident. ECF No. 1 at ¶ 127 ("'[M]y bleeding nose was then cleaned by medical nurse Kim Cheasman and [my] vital signs were checked."); 38-2 at 49 (medical record showing that a nurse checked Smith's blood pressure, pulse, and oxygen saturation following the incident). Nowhere else in the complaint does Smith complain about the supposed injuries he suffered during the incident, so he has not alleged or otherwise implied that he was ever in need of any further medical care. Thus, there is no claim for deliberate medical indifference arising from this incident against Terry.

If Smith means that Terry failed to appropriately respond to a complaint of excessive force, Smith has not sufficiently alleged that Terry was personally involved in the underlying use-of-force. Once again, a defendant must be personally involved in the alleged constitutional deprivation to be liable for damages under § 1983. *See Gaston*, 249 F.3d at 164. Personal

involvement of a supervisory defendant may be shown in a variety of ways:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [plaintiffs] by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

The Court observes at the outset that Terry did not directly participate in this incident—Smith asserts that Terry showed up in his cell after the incident was over. ECF No. 1 at ¶ 128.

Likewise, the rest of the *Colon* possibilities for personal involvement are not supported by the allegations. In short, Smith's interaction with Terry appears to be isolated; with the exception of this incident and the problem with Smith's toilet, Terry is not referenced a single other time in either complaint. Thus, there is no indication that Terry was informed of a wrong prior to the incident in question and failed to remedy it or, similarly, was deliberately indifferent by failing to act on certain information. For the same reason, Smith has failed to allege that this problem was caused by Terry's grossly negligent supervision of subordinates or that Terry created or tolerated a policy which allowed this incident to happen. Once again, Smith has merely alleged that he complained to Terry once about a use-of-force after it happened, and that Terry "refused to take the . . . complaint . . . seriously." ECF No. 1 at ¶ 128. That is not enough to show that Terry was personally involved in the incident.

Finally, the Court briefly addresses Smith's allegation that Terry "refused to have photographs taken of the plaintiff[']s face" following the alleged assault. *Id.* at ¶ 128. Smith is essentially asserting here that Terry failed to conduct a proper investigation of the alleged assault

44

after it occurred.  As the Court has previously stated, the law is settled that "that inmates do not enjoy a constitutional right to an investigation of any kind by government officials."  *See McCloud*, 55 F. Supp. 3d at 481 (citations and internal quotations omitted).  Accordingly, any claim against Terry arising from a failure to investigate is dismissed.

For the above reasons, Terry's motion to dismiss is GRANTED.

### R. *Defendant Wuest*

Defendant Wuest is a corrections official at Five Points.  Smith alleges that on November 20, 2011, Wuest came to Smith's cell after Smith made an emergency sick call request.  ECF No. 1 at ¶ 108.  Wuest placed handcuffs on Smith and then ordered Smith to turn around in his cell.  *Id.* at ¶ 109.  In Smith's own words, Smith "became seriously upset and began to verbally curse and threaten C.O.D. Wuest."  *Id.*  Wuest then allegedly applied Smith's waist chain in an excessively tight manner "and began to twist the plaintiff[']s metal waist chain with his hand, therefore causing the metal waist chain to[] dig into the plaintiff[']s waist causing the plaintiff pain and suffering."  *Id.*

Smith has effectively attempted to state another claim of excessive force for the tightening of a waist chain.  In general, an allegation that an official tightened handcuffs or waist chains is insufficient to state an excessive force claim unless it causes injury beyond temporary discomfort.  *See Rosenberg*, 2013 WL 1223516 at *3, *supra* Part IV.F, Part IV.L.  Smith has not alleged that he suffered any injury beyond temporary discomfort from this incident.  Therefore, the claim fails, and Wuest's motion to dismiss is GRANTED.

## CONCLUSION

For the reasons stated above, the Court dismisses the following claims *sua sponte*: (1) all claims for injunctive and declaratory relief, (2) the ADA and Rehabilitation Act claims for

money damages against the defendants in their individual capacities, (3) the ADA and Rehabilitation Act claims for money damages against the defendants in their official capacities, and (4) the § 1983 claims for money damages against the defendants in their official capacities. Notably, the Court substitutes DOCCS as the defendant for the official-capacity claims for money damages under the ADA and Rehabilitation Act.

Additionally, the motions to dismiss by the following defendants are GRANTED, and thus, they are dismissed from the case: Abbott, Atwood, Bellnier, Bianconi, Bradley, Burri, Colvin, Crance, Fischer, Lt. Gardener, Koenigsmann, Lempke, Levac, Parish, Patches, Piccolo, Scranton, Seidel, Sheahan, Terry, Trombly, Van Buren, and Wuest.  Additionally, the Court *sua sponte* dismisses O'Connor from the case.  The motion to dismiss by Mosko is DENIED.

IT IS SO ORDERED.

DATED:        May 23, 2016
              Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court